Davis et al. vs. Gaines.

---

## DAVIS et al. vs. GAINES.

PROMISSORY NOTES:  *When possession of, by payee not evidence of nonpayment.*

The possession of a note by a payee is *prima facie* evidence of nonpayment, but when such note was given as security for future advances by the payee on general account, and when such general accounts are rendered, the payor is charged with the amount of the note, which constitutes the security for the items of the accounts, and is given credit for assignments, etc., which go to the reduction of the general indebtedness, it will be considered as evidence of payment, if such credits are equal to the debits, or if not equal, *pro tanto*, and will rebut the presumption of nonpayment raised by the possession of the note by the payee.

PAYMENTS ON GENERAL ACCOUNT:  *When appropriated by law, to what items of account applied.*

The rule in the state of Louisiana as to payments made on general account, where no appropriation has been made either by debtor or creditor, is, that such payments, when appropriated by law, should be made to those items of the account most onerous to the debtor, and which it is most to his interest to have discharged.

APPEAL from *Chicot* Circuit Court.

Hon. HENRY B. MORSE, Circuit Judge.

*A. H. Garland,* for appellants.

*Bell & Carlton,* for appellee.

STEPHENSON, J.   Anthony H. Davis was, in the year 1855,

a planter in Chicot county, engaged largely in the cultivation of cotton. Abner L. Gaines was at that time a factor and commission merchant doing business in New Orleans, La., dealing in cotton, furnishing supplies and making advances to planters.

On the 13th day of January, 1855, Davis made five promissory notes to Benjamin P. and Richard M. Gaines, of Chicot county, each for $7,000, payable at the bank of Louisiana, in the city of New Orleans, on the first of February, in each of the successive years 1856, 1857, 1858, 1859 and 1860. The payment of these notes was secured by a deed of trust executed by Anthony H. and Mildred P. Davis, his wife, to the said Benjamin P. and Richard M. Gaines, on a large plantation in Chicot county, constituting his homestead or residence, together with all improvements, negroes, horses, mules, oxen, farming utensils, etc., thereon or belonging thereto. Benjamin P. and Richard M. Gaines were also named as trustees in said deed of trust. The notes were indorsed by the payees and returned to Davis, who subsequently placed them in the hands of Abner L. Gaines, who was his commission merchant. The notes were made to the Gaines' without value, the object being to secure by means of their indorsement such paper as could be advantageously negotiated in the market. Benjamin P. and Richard M. Gaines were, in fact, simply accommodation indorsers, and as such they secured themselves against loss by said trust. Such is the expressed intent and object as set out in the deed. The deed contains a further stipulation that in case Davis failed to pay either or any of the notes at maturity, the trustees, or the survivor in case of the death of either, should, at the request of the holders, or on their own motion, proceed to sell so much of the property as might be necessary to satisfy the note or notes then due and unpaid, after giving sixty days notice, etc. It was further stipulated

that Davis should remain in possession until default and sale. Abner L. Gaines received the notes from Davis, discounted them, and placed the proceeds to Davis' credit. From the time the notes were given until the last one was due, Davis continued his business of planting and his dealings with his factor, Gaines; and from the magnitude of the accounts rendered from time to time by the latter, it would seem that their transactions were extensive. Davis died in 1863, and in 1866 the trustees, at the request of Abner L. Gaines, who alleged that the last three notes were unpaid, advertised and sold the trust property to satisfy and pay said notes. The sale took place on the first of August, one Chapman Johnson becoming the purchaser for the sum of $20,000. Chapman subsequently conveyed to Abner L. Gaines, reciting in the deed that he had purchased as the agent of Gaines, who had paid the purchase money in the notes upon which the sale was made.

On the 18th day of February, 1870, Mildred P. Davis, widow of Anthony H., in right of dower and as administratrix of the estate of her deceased husband, and the heirs of the said deceased, who sue for themselves, as well as the creditors of said deceased, filed a bill in Chicot circuit court against Abner L. Gaines, to set aside the sale of the property, under the deed of trust, as fraudulent, and prayed that the deed of the trustees to Chapman, the deed of the latter to Gaines, and the original deed of trust be delivered up and cancelled, and that the notes, to satisfy which the sale was made, be surrendered to the administratrix, and that the property be decreed to her as such administratrix, to be by her disposed of by due course of administration, subject to her right of dower therein, etc.

The grounds argued in the bill for relief are: First, payment of the notes. Second, that by reason of the failure of the holder of the notes to notify the indorsers of the nonpayment

thereof, they ceased to be liable on the notes; and as the security taken was solely for their own indemnity, that it could not, after the liability of the indorsers had ceased, be held for the original debt. Gaines answered, denying payment, and the discharge of the trust property from liability. The bill went to the hearing upon the bill and exhibits, answer and exhibits, and depositions. The court found the sale by the trustees to Chapman to be valid, and decreed that Gaines be quieted in his title to the property. The plaintiff appealed. The record presents but two questions: First, Were the notes paid? Second, Was the property taken by the indorsers for their indemnity subject to the liability of the maker on the notes?

Before entering into an examination of the proof offered, it may not be amiss to state that the transactions between planter and factor are somewhat peculiar. The factor or commission merchant supplies the planter, not only with such supplies as he may need in his business of planting, but furnishes all else his needs require. Various methods are resorted to to secure these advances. Mortgages are sometimes taken upon the crops, or upon both crop and plantation, or, as in this case, such paper placed on the market, as can be negotiated for money. This method of transacting their business may serve to explain many items in stated accounts between them, which have no connection whatever with the business of planting. The notes, which are the basis of this suit, were given to secure advances made to Davis; they were placed in the hands of Gaines for that purpose. The further history of them will appear in the investigation of the evidence.

We will now proceed to the examination of the several accounts current rendered to Davis by Gaines, at irregular intervals, during the time covered by the notes. It will be borne in mind that the notes were given on the 4th of Febru-

ary, 1855. The first account current, exhibited in proof rendered by Gaines, runs from April 30, 1854, to January 29, 1855, and shows a debit against Davis of $16,905.65. The next running from Feb. 1, 1855, to Feb. 28, 1855, shows a debit against Davis of $17,961.08. The account running, from Feb. 28, 1855, to April 1, 1855, shows a credit in Davis' favor of $7,407.95. An examination of the credit side of this account shows that three of the notes here in controversy, to wit: those falling due in 1856, 1857 and 1858 were discounted by Gaines, and the proceeds, $6,397.22, $5,697.22 and $4,997.22, respectively placed to Davis' credit, as also were the proceeds of two other notes for $5,500 each, and the balance in his favor obtained by applying the proceeds of the several notes to the extinguishment of the balance due on the account.

The next account run from April 4, 1855, to April 1, 1856, and shows a balance due Gaines of $10,544. In this account, Davis is charged with the note which fell due Feb. 4, 1856 and he received credit for the proceeds of the remaining notes for $7,000 each, which fell due in 1859 and 1860. These notes were discounted by Gaines, and the proceeds, $4,900 and $4,200, respectively, placed to Davis' credit. The account running from April 4, 1856, to Sept. 1, 1856, shows a credit in favor of Davis of $567.89, which was again produced, in part, by discounting other notes for $10,500. The account running from Sept. 16, 1856, to July 16, 1857, shows a balance in favor of Davis of $372.40. On the debit side he is charged with the $7,000 note falling due February 4, 1857, and is also credited with the proceeds of two notes for $5,000 and $2,500, discounted as others had been. There is no account covering the time from July 16, 1857, to January 4, 1858, but the account commencing on the latter date states a balance brought forward due Gaines of $6,340.22. The ac-

count runs from January 4, 1858, to June 12, 1858. On the 4th of February, 1858, Davis is charged with the note for $7,000, falling due that day. The account shows a balance due Gaines, June 12, 1858, of $4,501.21. The account from June 12, 1858, to April 15, 1859, shows that on the 4th of February, 1859, Davis was charged with the $7,000 note then falling due, and that he received credit for the proceeds of a $5,000 note, discounted as other similar ones had been. The amount down to Davis' debit, April 15, 1859, is shown to be $14,447.46. The next account is rendered by H. Gaines, curator of the estate of A. L. Gaines, who had been interdicted by the court in Louisiana on account of mental derangement.

This account commences with the amount of $14,447.46, standing to the debit of Davis, as shown by the last account rendered by A. L. Gaines, and runs from April 15, 1859, to May 28, 1860, showing a debit against Davis, at the latter date, of $7,662.85. In this account Davis is charged with the $7,000 note falling due Feb. 4, 1860, being the last of those in controversy, and is credited with the proceeds of notes of his own and those of J. F. Robinson, amounting in the aggregate to over sixty thousand dollars. The last of these accounts runs from May 28 to November 16, 1860. The debit side receives no other item than that of interest, while Davis is credited with the sale of 396 bales of cotton, and, as finally rendered by the curator, shows a balance to the credit of Davis of $5,453.58. If we take the showing made by these accounts as conclusive, it would seem that the notes had been fully paid off under any rule of applying payments, but Gaines, in his answer which is part of the evidence in the case, positively denies the payment of the notes falling due in 1858, 1859, and 1860, described as numbers 3, 4, and 5. As to notes 3 and 4, he swears that they remained in his possession, and insists that such possession is *prima facie* evidence of nonpay

ment. As to No. 5 he says the curator of his estate had no right, and could not legally deliver it up as paid, thereby discharging the ample security, and take in lieu thereof notes of the debtor or any other person wanting in this important particular. He states further that by a special understanding with Davis, notes 3 and 4, notwithstanding the fact that they were charged in the account, were held by him as a special security for future advances. Ordinarily the possession of notes by the payee would import nonpayment, but the circumstances of this case, and the peculiar manner of transacting business between the planter and his commission merchant as testified to by several witnesses, weakens, if it does entirely overturn the presumption.

It will be seen that the notes are uniformly made a part of the accounts against Davis as they became due, and if the credits equal the debits, it would seem that such a statement, made by the payee or holder of the note, would be ample evidence to rebut the presumption raised by the mere possession of the notes; neither would such presumption necessarily follow, if, after credits given to the general account, there should remain an amount due equal to the note; for a proper application of such credits might discharge the notes and leave other items of the account unpaid. The notes given in this case were not taken in payment of a debt account, but were intended to secure an anticipated indebtedness by reason of advances made. The mode of paying such advances was mainly by the consignment of his crop to his creditor. The stated accounts were intended to show the condition of their affairs as from time to time either might desire. The notes, while they do not represent the debt itself, mark the extent of the planter's liability to his merchant, and they are for that reason charged in the account. The proceeds of the notes, when discounted, constitute an item of credit to be

entered in favor of the planter, and such credit, which he is at liberty to exhaust at pleasure by drawing upon it, is what is termed advances. Now, when consignments of produce, etc., are made and credit given therefor on the general account, the irresistible conclusion must be that such credits must go to the extinguishment of the debt, of which the notes are at once the evidence and security; and, when such accounts are rendered in which the debtor is charged with the amount of the note which constitutes the security for the items of the account, and he is given credit for consignments of produce which goes to the reduction of the general indebtedness, it will be considered as evidence of payment if such credits are equal to the debits; or, if not equal, so *pro tanto*, and will rebut the presumption of nonpayment raised by the possession of the notes by the payee, and are so contradictory of his statement of nonpayment that it must be disregarded. Gaines swears to an understanding between himself and Davis, subsequent to the making, that notes three and four were to be held by him as a special security for future advances. This statement comes within the prohibition contained in sec. 22, art. VII of the constitution, and is inadmissible. But, if this were not so, his accounts are flatly contradictory of such a theory. As they fell due, these notes were charged against Davis, and his letter to Davis of October 11, 1860, written after the debit of note 4 was made, states that the amount then to his debit is $2,339.48. We are of opinion, therefore, that notwithstanding his possession of the notes and his denial of their payment, he has, by his own accounts rendered at the time, and which are equally as conclusive of payment as his present statement is of nonpayment, furnished evidence which must be taken in preference to the afterthought found in his answer. The accounts as rendered by Gaines, which are sufficiently authenticated to be admissible in evidence, are

conclusive upon him, and the question of payment must be determined by them. It is obvious that the accounts, so far as they affect the question of the liability of the parties, are not conclusive. Although the last one shows a balance down to the credit of Davis of over $5,000, it is apparent that such statement as to the true condition of their affairs cannot be taken as true; for this credit was largely obtained by crediting him with the proceeds of over sixty thousand dollars in notes.

The actual state of the account, if made upon final settlement, would be found by ascertaining what of these notes remains unpaid and not charged in the account to Davis' debit and setting off against the whole debit, the sums for which he is rightfully entitled to credit. But this it is impossible to do, as neither their character nor the time when given or when falling due can be ascertained from the proof; nor is it material to this issue that we enter into such an inquiry. Sufficient can be ascertained from the accounts to enable us to settle the question as to the payment of the notes in controversy here. It will be seen from the accounts, that at the time the notes were given no other debt existed against him of the onerous character created by the trust given to secure their payment. But if this were not so, the earlier accounts current show that all indebtedness, prior to their execution, was fully paid off by these notes and proceeds of cotton, etc. And Gaines himself concedes the payment of notes 1 and 2, so that whatever indebtedness is found to exist against Davis, we must presume to have been contracted in or subsequent to the giving of the notes. It must be assumed further that the contract entered into, at the time the notes were given, was of the highest class, and the most onerous to the debtor Davis existing at the time; and although nothing is shown as to the character of subsequent transactions between the parties when

Davis et al. vs. Gaines.

other notes were taken, it cannot be presumed that Davis entered into more onerous ones, for the absolute sale of his homestead and personalty belonging to it, as a security for a debt, we take it, is the highest possible security one could give; it is certainly the most onerous debt which can be contracted. The notes were made payable at New Orleans, and Gaines was doing business there; the laws of Louisiana, therefore, must be applied to the transaction of the parties. The rule in that state, as to payments made on general account, when no imputation has been made either by debtor or creditor, is that such payments, when imputed by law, should be made to those items of the account most onerous to the debtor, and which it is most to his interest to have discharged. This rule is derived, as is the whole Code of Louisiana, from the civil law.

The reports of the state abound in decisions upon the subject, and almost every conceivable character of debt has been assigned its proper place in this theory of imputation. We cite such only as seem to embrace the class to which we conceive these notes belong. *N. O. Ins. Co. v. Tio*, 15 La. Ann., 174; *Spiller & Allen v. Their Creditors*, 16 id., 292, 375; *Wickner v. Croghan*, 4 La. (N. S.), 79; *Johnson v. Sterling*, 3 id., 483; *Abodie v. Poydras*, 6 id., 26; *Pargoud v. Griffing's Adm'r*, 10 La., 356; *Cox v. Rees*, 10 id., 232; *Morine Denis v. Ramouin*, 1 Rob., 318; *Follain v. Orillion*, id., 506; *Dunlop & Co. v. Farkington*, 5 La. Ann., 569; *Compton v. Compton*, id., 616; *Dunbar v. Bullard*, 2 id., 810; *Byrne v. Grayson*, 15 id., 457. Applying this rule to the case at bar, we find that inasmuch as neither party imputed the amounts paid by Davis, and as the five notes were the most onerous, and such as Davis had the most interest in having discharged, the payments, as they severally fall due, must be imputed to them.

The evidence shows conclusively that the consignments of

cotton alone, leaving out of the question the new notes given, and the questions of novation raised upon them, was more than sufficient to discharge each and all of them, and they must, under the operation of the Louisiana rule, be considered by us as paid.   This conclusion renders it unnecessary to consider the second question raised in the case.

The decree of the court below, for the reasons given, must be reversed, and a decree will be entered in this court in accordance with the prayer of the bill.